1
2
3
4
5
6

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

7
8
9

| | |
|---|---|
| SUN PACIFIC MARKETING<br>COOPERATIVE, INC., | ) ) ) |
|         **Appellant**, | ) ) |
|     **v.** | ) ) |
| **DIMARE FRESH, INC.,** | ) ) |
|         **Appellee**. | ) ) ) |

CIV-F-06-1404 AWI GSA

**ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT**

### I. History

Both Appellant Sun Pacific Marketing Cooperative, Inc. ("Sun Pacific") and Appellee DiMare Fresh, Inc. ("DiMare") are companies engaged in buying and selling wholesale quantities of produce.  Both parties are licensed commission merchants and dealers under 7 U.S.C. §499a(b)(5) and (6).  By contract dated June 5, 2006 ("Original Contract"), DiMare agreed to buy from Sun Pacific a set quantity of various types of tomatoes at set prices every week from July 17, 2006 through October 31, 2006. Doc. 120, Part 2.  The Original Contract specified that "In the event of a product shortage caused by an Act of God, Natural disaster or other incident that could not be foreseen and is beyond the control of Sun Pacific, then performance under this contract shall be excused."  Starting in July the San Joaquin Valley of California, where Sun Pacific's growing facilities were located, experienced a heat wave that negatively affected tomato crops.  On August 31, 2006, Sun Pacific orally informed DiMare that it was invoking the Act of

1   God clause.  By letter dated September 1, 2006, DiMare asked for written clarification. Doc. 120,

2   Part 12.  By letter dated September 4, 2006, Sun Pacific notified DiMare that it was canceling

3   performance of the Original Contract under the Act of God provision due to tomato shortages

4   caused by heat during July and August in Central California. Doc. 120, Part 5.  Between

5   September 7 and September 12, 2006, Sun Pacific continued to sell DiMare tomatoes.  Sun

6   Pacific argues that the sales were pursuant to a new understanding between the parties with a

7   higher sales price ("Provisional Agreement").  DiMare argues that they were made pursuant to

8   the Original Contract, and paid Sun Pacific based on the prices contained therein.  By letter dated

9   September 12, 2006, DiMare outlined its objections to Sun Pacific's interpretation of the

10  Original Contract.  There do not appear to have been any more tomato sales by Sun Pacific to

11  DiMare after September 12, 2006.  DiMare purchased tomatoes from other companies on the

12  open market for the remainder of the Original Contract term.

13         DiMare first brought suit on September 14, 2006 against Sun Pacific, alleging breach of

14  the Original Contract and seeking specific performance (DiMare v. Sun Pacific, CIV 06-1265

15  AWI).  This court denied DiMare's request for a temporary restraining order which sought to

16  force Sun Pacific to sell tomatoes to DiMare in accordance with the quantity and price terms of

17  the Original Contract.  On September 25, 2006, DiMare voluntarily dismissed the suit without

18  prejudice.  On October 11, 2006, Sun Pacific filed suit against DiMare (the origin of the present

19  case).  Sun Pacific's active complaint includes five causes of action: 1) declaratory relief that Sun

20  Pacific was entitled to invoke the Act of God clause of the Original Contract; 2) violation of

21  Perishable Agricultural Commodities Act ("PACA") for failure to pay under the Provisional

22  Agreement; 3) breach of contract of the Provisional Agreement; 4) declaratory relief that Sun

23  Pacific is entitled to the benefits of a PACA trust based on the Provisional Agreement; and 5)

24  enforcement of the PACA trust. Doc. 10, Amended Complaint.  DiMare filed a counterclaim

25  which includes four causes of action: 1) violation of PACA for failure to deliver under the terms

26  of the Original Contract (alleging the Act of God clause does not apply); 2) breach of the

27  Original Contract; 3) violation of PACA for failure to deliver conforming goods on five specific

28  purchase orders; and 4) breach of contract on those five specific purchase orders. Doc. 16,

1 Answer and Counterclaim.  Neither party has made a request for a jury trial.

2 On January 8, 2007, DiMare filed a formal reparation complaint pursuant to PACA

3 provision 7 U.S.C. §499f(a) with the USDA ("Reparation Proceeding"), seeking damages for

4 breach of the Original Contract and two shipments of tomatoes that had defects.  Though the

5 court can not be certain, it appears that DiMare raised all claims contained in its counterclaim.

6 The Reparation Proceeding was assigned PACA File number, W-07-61.  On April 19, 2007, the

7 court stayed this case pending the resolution of the Reparation Proceeding. Doc. 32.  The

8 Reparation Proceeding progressed and in December 2007, the USDA held a hearing in Los

9 Angeles, CA.  William Jenson, a Judicial Officer of the USDA ("USDA ALJ") issued a formal

10 decision and order ("Reparation Order") on August 22, 2008. Doc. 123, Part 3.  The USDA ALJ

11 concluded there was no "product shortage" and awarded DiMare $1,136,599 plus interest, fees,

12 and costs.

13 On September 19 and 22, 2008, Sun Pacific filed a notice of appeal, petition, and bond

14 pursuant to 7 U.S.C. §499g(c) in this court.  The court examined whether jurisdiction and venue

15 were proper and ultimately found the appeal was properly filed in Fresno. Doc. 51.  Both Sun

16 Pacific and DiMare have filed for summary judgment.  Sun Pacific seeks summary adjudication

17 on count on of its amended complaint (breach of the Provisional Agreement) and counts one and

18 two of DiMare's counterclaim (violation of PACA for failure to deliver under the terms of the

19 Original Contract and breach of the Original Contract). Doc. 119.  DiMare seeks summary

20 judgment enforcing the Reparation Order. Doc. 118.  DiMare treats this matter as an appeal and

21 does not appear to be proceeding on the basis of Sun Pacific's amended complaint and its

22 counterclaim.  Both parties opposed the other's motion.  The matter was taken under submission

23 without oral argument.

24

25 ## II. Legal Standards

26 "Rule of Civil Procedure 56(f) provides a device for litigants to avoid summary judgment

27 when they have not had sufficient time to develop affirmative evidence." Burlington Northern &

28 Santa Fe R.R. Co. v. The Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation,

1    Montana, 323 F.3d 767, 773-74 (9th Cir. 2003).  Rule 56(f) reads:

2       (f) When Affidavits are Unavailable. Should it appear from the affidavits of a party
3       opposing the motion that the party cannot for reasons stated present by affidavit facts
        essential to justify the party's opposition, the court may refuse the application for
4       judgment or may order a continuance to permit affidavits to be obtained or depositions to
        be taken or discovery to be had or may make such other order as is just.

5    The Ninth Circuit has explained that in order to prevail on a Rule 56(f) motion, the party "must

6    show (1) that they have set forth in affidavit form the specific facts that they hope to elicit from

7    further discovery, (2) that the facts sought exist, and (3) that these sought-after facts are

8    'essential' to resist the summary judgment motion." State of California v. Campbell, 138 F.3d

9    772, 779 (9th Cir. 1998).  "In making a Rule 56(f) motion, a party opposing summary judgment

10    'must make clear what information is sought and how it would preclude summary judgment.'"

11    Margolis v. Ryan, 140 F.3d 850, 853 (9th Cir. 1998), citations omitted.  The burden is on the

12    party seeking to conduct additional discovery to put forth sufficient facts to show that the

13    evidence sought exists.See Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v.

14    Clorox Co., 353 F.3d 1125, 1129-30 (9th Cir. 2004).

15       Factors courts have considered in granting motions pursuant to Rule 56(f) include: (1) a

16    summary judgment motion made early in the litigation before relevant discovery could be

17    completed; (2) discovery having been stayed by court order; (3) the case involving complex facts

18    requiring additional discovery; (4) the material facts are within the exclusive knowledge of the

19    moving party; (5) discovery requests are currently outstanding to the moving party; and (6)

20    the motion raises new and unanticipated issues. See Schwarzer, Tashima, Wagstaffe, Cal.

21    Practice Guide: Fed. Civ. Pro. Before Trial, §14:115 (The Rutter Group 2005), citing Garrett v.

22    San Francisco, 818 F.2d 1515 (9th Cir. 1987), DiMartini v. Ferrin, 889 F.2d 922  (9th Cir. 1989),

23    and Weir v. Anaconda Co., 773 F2d 1073 (10th Cir. 1985).  District courts have the discretion to

24    deny further discovery "if the movant has failed diligently to pursue discovery in the past, or if

25    the movant fails to show how the information sought would preclude summary judgment."

26    Clorox Co., 353 F.3d at 1130; Cal. Union Ins. Co. v. Am. Diversified Sav. Bank, 914 F.2d 1271,

27    1278 (9th Cir. 1990).

28       However, when a summary judgment motion is filed "so early in the litigation, before a

**4**

party has had any realistic opportunity to pursue discovery relating to its theory of the case, district courts should grant any Rule 56(f) motion fairly freely....[where] no discovery whatsoever has taken place, the party making a Rule 56(f) motion cannot be expected to frame its motion with great specificity as to the kind of discovery likely to turn up useful information, as the ground for such specificity has not yet been laid." Burlington Northern & Santa Fe R.R. Co. v. The Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation, Montana, 323 F.3d 767, 773-74 (9th Cir. 2003), citations omitted.been laid." Burlington Northern & Santa Fe R.R. Co. v. The Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation, Montana, 323 F.3d 767, 773-74 (9th Cir. 2003), citations omitted.

### III. Statements of Material Fact

**A. Sun Pacific's Statement**[1]

1. Sun Pacific grows and sells citrus, tree fruit, grapes and kiwi to customers nationwide. Sun Pacific grows round, Roma, and grape tomatoes on farms located in the San Joaquin Valley.

2. Growers like Sun Pacific enter into season-long contracts for the sale of their expected crops in order to sell a portion of the weekly production at a modest margin, while selling the remainder of the crop at market prices.

Denied.

3. Al Bates oversees Sun Pacific's tomato sales and is responsible for the farming and packing of tomatoes.

4. Tom Gilardi is one of Sun Pacific's tomato salesman.

---

[1]Sun Pacific's statement is contained in Doc. 119, Part 4.  DiMare's disputes are contained in Doc. 123, Part 2.

5. DiMare, Inc. is headquartered in Dallas, with offices throughout the country, including California.

6. DiMare buys tomatoes from growers in California and Mexico, repacks them, and sells them to customers such as foodservice companies and grocery stores.

7. Sam Licato buys tomatoes grown on the west coast for DiMare's nationwide repacking locations, and is responsible for DiMare's sales to regional and national customers.

8. Sam Licato first became acquainted with Sun Pacific while buying tomatoes for another company is the early 1980's.

9. Tomatoes are grown in the San Joaquin Valley of California between mid-June and November of each year.

10. During the California tomato season, there are expected highs and lows in production; early in the season there is normally strong production, there are production drops between mid-August to mid-September, and then strongest production is in October.

11. Gas green tomatoes are a type of round tomato. Both gas green and Roma tomatoes grown in the San Joaquin Valley are grown on the ground, picked at a certain stage of maturity, and then later ripened.

12. Between 2003 and 2005, Sun Pacific planned its tomato crop with projected yields of 1,550 boxes per acre of round tomatoes, and 1,650 boxes per acre of Roma tomatoes. While there were normal fluctuations in production during the season; Sun Pacific's yields were consistent with those projections, and it fully performed under the contracts.

13. In 2006, Sun Pacific increased its acreage by 32%, and Sun Pacific projected yields of consistent with the previous years 1,556 boxes per acre of Rounds, and 1,650 boxes per acre of Romas.

14. In 2006, DiMare entered into contacts with Wal-Mart, as well as the fast food chains Jack-in-the-Box and Subway, for the sale of tomatoes. DiMare's contracts with Subway and Wal-Mart included Act of God clauses, protecting both parties in the event of a shortage caused by an event outside the control of either party.

   Denied.

15. In July, 2006, Sun Pacific and DiMare entered into a contract for the purchase and sale of round and Roma tomatoes grown by Sun Pacific. The parties had entered into similar contracts in 2003 and 2005; and DiMare also bought tomatoes from Sun Pacific at the open market. The 2006 contract (the "Contract") was negotiated between Sam Licato and Tom Valenzuela, who was a salesman for Sun Pacific at the time. The Contract was drafted by Sun Pacific using the 2005 contract as a form, and was signed by Al Bates and by Sam Licato.

16. Under the Contract, Sun Pacific agreed to sell 19,200 boxes of various size gas green round tomatoes and 3,200 boxes of Romas tomatoes to DiMare each week between July 17 and October 31, 2006. Under the Contract, Sun Pacific expected to sell approximately 11% of its projected yields to DiMare at near break-even prices of between $5.45 and $7.95 per box. Sun Pacific had fixed production costs that were low compared to other areas growers, and it expected to break-even or generate little profit on the sale of 11% of production to DiMare.

17. The tomatoes supplied by Sun Pacific were not earmarked by DiMare to fill the orders or contracts of any specific customer of DiMare, and DiMare's contract purchases represent only a small percent of its total supply needs.

18. Paragraph 6 of the Supply Agreement provides:

> Shippers' obligation. In the event of a product shortage caused by an Act of God, Natural disaster or other incident that could not be foreseen and is beyond the control of Sun Pacific, then performance under this contract shall be excused.

19. It is customary to have an "Act of God" clause in tomato sales contracts to protect against factors in production that are beyond the control of the grower, such as a yield reduction, which result in the grower having insufficient product to supply.

Denied.

20. The Contract was verbally modified to reduce the volume of 6x6 round tomatoes.

21. Sun Pacific and DiMare performed under the Contract between July 16th and late August. Each week Sam Licato would fax an order sheet to Tom Gilardi, the salesman who replaced Tom Valenzuela. That order sheet listed the next week's loads, the P.O. number, and the DiMare distribution center. Tom Gilardi would fill in the pickup number for each load, and fax the order sheet back to Sam Licato with a pick up number.

22. During July, 2006, the temperatures in the San Joaquin Valley were over 104 degrees for 2 weeks, and similar temperatures had not been experienced in the San Joaquin Valley in decades.

Denied.

23. Early on, the market was below the contact price at $2-$4/box, later market was $20.00-$30.00 higher than the contract.

24. This heat had a significant impact on Sun Pacific's yields, and on the yields of tomatoes growers throughout the San Joaquin Valley. The heat caused the tomato plants to stop growing and producing fruit, prevented the plants from pollinating, and caused the plants that did grow to bear fruit [that was] small, and oftentimes misshapen and unmarketable.

25. Heat caused severe shortage of tomatoes from the San Joaquin Valley for approximately half of the season; there was an acute shortage in September, and average production did not resume until late October. Simultaneously, the heat also caused severe shortages in tomatoes grown on East Coast of United States.

      Denied.

26. Between August 1 and late September, 2006 Sun Pacific's yields were more than 40% less than expected, and Sun Pacific did not have enough tomatoes to sell to DiMare and to its regular market customers, and Sun Pacific continued to sell to DiMare until it was impossible to fill the orders and other growers were also invoking Act of God clauses in their contracts.

      Denied.

27. Around August 18-20, Tom Gilardi told Sam Licato that Sun Pacific may invoke the shortage clause because it was having difficulty fulfilling the Contract and it expected the shortage to get considerably worse. Once Sun Pacific determined that the shortage would persist until September and October, continued sales to DiMare under the contract would jeopardize Sun Pacific's tomato business.

      Denied.

28. On August 31, 2006, Tom Gilardi notified Sam Licato that it was going to invoke its rights under ¶6 of the Contract, and offered to modify the Contract to the market price. Sam Licato was unhappy, but agreed to pay the market price until conditions returned to normal.

      Denied.

29. Licato admitted in his testimony before the U.S.D.A. that he verbally agreed to accept the tomatoes at the market price.

      Denied.

30. That same day, Sam Licato faxed DiMare's order sheet for the week of September 4-9 at the Contract prices.

31. The following day, on September 1, Tom Gilardi crossed out the prices and wrote "market price" and "let me know"; and faxed the order sheet asking DiMare to confirm the price, then faxed it back to DiMare.

32. On September 1, the market price for Roma tomatoes was $15.45 per box, and the market for round tomatoes was $11.45 per box.

33. Sam Licato did not object in writing to the prices in Tom Gilardi's September 1 fax, and proceeded with those sales between September 5 and 9.

34. On September 1, 2006, Sam Licato sent a letter to Tom Gilardi seeking clarification from Sun Pacific as to what their position was regarding the prices and the Act of God. That letter does not demand Sun Pacific's ongoing performance, and requested a letter of explanation from Sun Pacific regarding its yield reductions.

    Denied.

35. On September 4, Sun Pacific sent the requested letter to DiMare explaining that Sun Pacific had supplied under the Contract despite the severe shortage that had began weeks earlier, and stating that that Sun Pacific will be enforcing the Act of God provision in paragraph 6 of the contract.

    Denied.

36. Sam Licato did not respond to September 4 letter, and DiMare proceeded to pick up 12 loads from Sun Pacific between September 7 and 12, and Sun Pacific invoiced DiMare at the market price.

37. On September 8, Sam Licato sent the order sheet for the week of September 11 to Sun Pacific listing the price as the market price. Sun Pacific accepted those orders on September 9.

38. DiMare admits that Sun Pacific believed that DiMare would pay the market for the tomatoes sold.

      Denied.

39. On September 11, DiMare received the invoices for the produce shipped by Sun Pacific on September 6, 7, and 8 at the market price; however DiMare issued payments for invoices at the Contract prices. Sun Pacific learned of the short payment on September 13 and stopped selling to DiMare.

40. On September 12, 2006, DiMare's attorney notified Sun Pacific that DiMare intended to enforce the prices in the original Contract, and Sun Pacific first learned that DiMare refused to accept the Act of God and enforce the original Contract.

      Denied.

41. DiMare increased the prices with Jack-in-the-Box (even though its contract with DiMare did not include an Act of God Clause) and with Subway above the contract prices in September and October, 2006, and returning back to the contract levels in late October.

42. By September 18, the market exceeded $30 per box for Romas and $27 per box for Rounds.

      Denied.

43. Despite Sun Pacific's termination of the contract, Sam Licato continued to send order sheets on a weekly basis through the end of the contract period, noting the Contract prices.

**B. DiMare's Statement**[2]

1. In July 2006, DiMare and Sun Pacific Marketing Cooperative, Inc. ("Sun Pacific") entered into a contract for the sale of tomatoes to be delivered by Sun Pacific Marketing Cooperative, Inc., to DiMare Fresh, Inc. from July 17 through October 31, 2006. The Contract called for Sun Pacific to deliver fourteen loads of tomatoes per week at prices ranging from $4.35 to $7.95 per carton.

2. The terms of the Contract were negotiated between DiMare's sales representative, Sam Licato, and Sun Pacific's sales representative, Tom Valenzuela. While Mr. Licato negotiated the terms of the Contract with Mr. Valenzuela, another of Sun Pacific's sales representatives, Tom Gilardi, was Mr. Licato's primary point of contact during the Contract performance period.

3. The Contract was signed by Sam Licato, for DiMare, and Al Bates, for Sun Pacific. Though he signed the Contract, Mr. Bates was not involved in negotiating the Contract terms with DiMare.

4. For the first six weeks of the Contract terms, Sun Pacific delivered tomatoes, per the Contract, to DiMare. DiMare paid for these shipments at the Contract price. During this time, Mr. Licato faxed weekly delivery order sheets to Sun Pacific for Contract deliveries to be made the following week.

5. During the first six weeks of Contract performance, the market price of tomatoes fluctuated. There were times when the market price for tomatoes was below the Contract price and there were times when the market price was above the Contract price.

6. At times during the first six weeks of performance, DiMare permitted Sun Pacific to substitute slightly smaller, 5x6 tomatoes for the larger, 5x5 tomatoes specified in the Contract. DiMare also

---

[2]DiMare's statement is contained in Doc. 118, Part 3.  Sun Pacific's agreement with DiMare's statement is contained in Doc. 127, Part 1.

permitted some flexibility as to the quantities of tomatoes shipped from week to week.

7. In July 2006, the San Joaquin Valley of California experienced a heat wave. The recorded daytime high temperature, the nighttime low temperatures, and soil temperatures were above average and frequently above the normal range for this time of year.

8. The heat wave during the summer of 2006 resulted in an approximately 33% reduction in Sun Pacific's expected round and Roma tomato production for the 2006 summer growing season. Other growers in the San Joaquin Valley experienced similar losses due to unusually high temperatures.

9. Beginning in mid to late August, Sun Pacific's sales representative, Tom Gilardi, began to indicate to DiMare's sales representative, Sam Licato that due to the severe weather, Sun Pacific was considering invoking the Act of God clause in the Contract.

10. On August 31, 2006, Tom Gilardi sent a copy of an email to Mr. Licato indicating that a company called "Custom Pak" was abandoning its existing contracts due to produce shortages resulting from extreme heat in Virginia and California. The contracts referenced in the email were between Custom Pak and its customers and were not related to the Contract between DiMare and Sun Pacific. Mr. Licato interpreted this email as an indication that Sun Pacific was preparing to invoke Act of God clause in its Contract with DiMare.

11. On August 31, 2006, Sun Pacific's representative, Tom Gilardi, orally notified Sam Licato that Sun Pacific was going to invoke the Act of God clause in the Contract and would no longer supply DiMare with tomatoes at Contract prices. Mr. Licato requested an explanation in writing as to Sun Pacific's position and justification for invoking the Act of God clause.

12. On August 31, 2006, Mr. Licato sent Sun Pacific a weekly delivery order sheet for delivery of

13

tomatoes under the Contract for the week of September 4th. Mr. Gilardi returned this order sheet to DiMare on September 1, 2006, with the prices on the sheet lined out and "market price" written in at the top of the page.

13. On September 1, 2006, Mr. Licato sent a letter to Mr. Gilardi requesting additional information regarding Sun Pacific's invoking the Act of God clause in the Contract.

14. On or about September 1, 2006, Tom Gilardi informed Sam Licato that Sun Pacific would only supply tomatoes to DiMare at market prices, not Contract prices.

15. On September 4, 2006, Al Bates of Sun Pacific sent Mr. Licato a letter stating that Sun Pacific was invoking the Act of God clause in the Contract and would no longer supply tomatoes at Contract prices. The letter indicated that Sun Pacific would attempt to continue to supply DiMare with tomatoes in a "short market".

16. From September 6-11, 2006, Sun Pacific supplied tomatoes to DiMare under the August 31st order faxed by Sam Licato. The invoices accompanying these shipments indicated that Sun Pacific was billing DiMare at market prices. Without notifying Sun Pacific, DiMare remitted payment to Sun Pacific at the lower Contract pricing levels.

17. On September 8, 2006, Sam Licato sent a delivery order sheet for the week of September 11, 2006, to Sun Pacific listing "market" prices as the costs of the tomatoes in this order.

18. On September 12, 2006, DiMare sent a letter, through its counsel at the time, to Sun Pacific indicating that DiMare considered Sun Pacific's invoking the Act of God clause to be improper and that DiMare expected Sun Pacific to resume performance under the Contract.

19. On September 13, 2006, Sun Pacific shipped two of the loads from September 8th order sheet

14

to DiMare. Both of these loads were invoiced by Sun Pacific at market prices. As it had done previously, DiMare remitted payment to Sun Pacific at the lower Contract pricing levels.

20. On or about September 14, 2006, Sun Pacific became aware that DiMare was paying Contract prices for recent shipments, not the full invoice amounts, and stopped supplying tomatoes to DiMare.

21. For the remainder of the Contract period, Mr. Licato sent weekly delivery order sheets to Sun Pacific. These order sheets requested weekly delivery of the contracted quantities of tomatoes at Contract prices. Sun Pacific did not deliver any additional tomatoes to DiMare during the Contract period.

22. During the remainder of the Contract period, DiMare purchased tomato loads to replace the tomatoes specified in its Contract with Sun Pacific.

23. During the contract period, Sun Pacific had no other fixed contracts for the sale of tomatoes.

24. Throughout the contract period, Sun Pacific produced a quantity of tomatoes in excess of the amount it required to meet the requirements of the contract.

25. Over the course of the growing season, Sun Pacific produced roughly five times the amount needed to fully perform under its Contract with DiMare.

## IV. Discussion

The parties are moving for summary judgment on different issues. DiMare is seeking a determination that Sun Pacific breached the Original Contract as it did not have the right to invoke the Act of God clause. Sun Pacific is seeking a determination that DiMare agreed to modify the Original Contract and that DiMare breached the subsequent Provisional Agreement.

**A. PACA Appeal**

In appeal, "suit in the district court shall be a trial de novo and shall proceed in all respects like other civil suits for damages, except that the findings of fact and order or orders of the Secretary shall be prima-facie evidence of the facts therein stated." 7 U.S.C. §499g(c).  "Thus the party petitioning for an appeal of a reparation order had the burden of production of evidence that rebuts the findings of fact by the Secretary." Procacci Bros. Sales Corp. v. Frank's Distrib. of Produce, LLC, 2009 U.S. Dist. LEXIS 42671, *16 (D. Ariz. Apr. 6, 2009), citing Lee Loi Industries, Inc. v. Impact Brokerage Corp., 473 F.Supp.2d 566, 568 (S.D.N.Y. 2007).

DiMare argues that under these rules, "To the extent an appellant disputes facts found by the Secretary, which have prima facie weight, it would be nearly impossible to obtain summary judgment, unless the appellee concedes that the Secretary was incorrect as to any findings of fact which the appellant disputed or the appellant effectively rebuts the Secretary's findings with evidence not before the [USDA ALJ]." Doc. 123, Part, 1, DiMare's Opposition, at 3:17-22. DiMare's sole citation on this matter is to a case from the D.C. Circuit.  Examination of that opinion shows that DiMare's interpretation of the burdens involved is not quite accurate: "Appellant asserts, without the benefit of authority, that 'the Secretary's findings are prima facie evidence but are not dispositive on a motion for summary judgment.' While the Secretary's findings could not be conclusive had they been opposed properly, appellee is correct that even for purposes of summary judgment, 'the Secretary's findings are dispositive when there is no evidence submitted in dispute.' This interpretation gives effect to the prima facie clause of the Act, by making the Secretary's findings conclusive unless effectively rebutted. Once rebutted, the Court is then able to reweigh the evidence, thus giving effect to the provision for de novo review. Our interpretation also gives effect to the mandate that the proceeding before the District Court proceed in all respects like other civil suits for damages." Frito-Lay, Inc. v. Willoughby, 863 F.2d 1029, 1033 (D.C. Cir. 1988), citations omitted.  There is no requirement that appellant needs to present evidence not before the USDA ALJ to rebut his/her findings.  In Frito-Lay, the appellant submitted no evidence to the district court, leading the D.C. Circuit to "reject appellant's claim that the 'district court should have examined the entire record when considering Mr.

1  Willoughby's summary judgment motion.' Appellant's failure to designate and reference triable

2  facts was, in light of the language of Rule 56(c) and governing precedent, fatal to its opposition."

3  Frito-Lay, Inc. v. Willoughby, 863 F.2d 1029, 1034 (D.C. Cir. 1988).  Thus, Sun Pacific can

4  certainly rely on evidence that was presented to the USDA ALJ in order to rebut his findings.

5  "[A]ppellant's counsel asserted to the District Court at oral argument of the cross-motions 'I've

6  got a whole transcript of sworn testimony in the administrative hearing...[and] that testimony is

7  sworn and it is very verified and therefore, it does create a disputed fact on that pivotable [sic]

8  issue.' But appellant did not present that transcript full of sworn testimony into the District

9  Court's record. We cannot speculate at this date on what would have been the result had

10  appellant done so."[3] Frito-Lay, Inc. v. Willoughby, 863 F.2d 1029, 1036 (D.C. Cir. 1988).  In any

11  case, Sun Pacific has presented evidence that was not presented to the USDA ALJ. See, e.g.

12  Licato Deposition, Gregory Deposition, Spinnazola Deposition.

13

14  **B. Act of God Clause**

15      The Original Contract specified that "In the event of a product shortage caused by an Act

16  of God, Natural disaster or other incident that could not be foreseen and is beyond the control of

17  Sun Pacific, then performance under this contract shall be excused." Doc. 120, Part 2, Original

18  Contract.  The Original Contract was negotiated between Tom Valenzuela on behalf of Sun

19  Pacific and Sam Licato on behalf of DiMare.  Sun Pacific argues that the term "product shortage"

20  means a quantity of grown tomatoes that was less than the expected yield.  DiMare argues the

21  term means a quantity of grown tomatoes less than that needed to fulfill the deliveries under the

22  Original Contract.  The USDA ALJ found that the extrinsic evidence supported DiMare's

23  interpretation.  DiMare called upon Sam Licato to testify while Sun Pacific did not call Tom

24  Valenzuela to testify at the hearing.  Sam Licato stated "If you had the product, I expected to get

25  the product....That was my position when I made [the Original Contract]." Hearing Transcript, at

26  ────────────────

27      [3]While the D.C. Circuit is technically discussing an appellant's opposition to appellee's
   motion for summary judgment, the point holds that the record of an administrative proceeding
28  can be used to rebut the USDA ALJ's findings.

228:18-229:1.  The USDA ALJ found "Mr. Licato's interpretation of the term 'shortage' is not only reasonable, it is un-refuted," and ruled in favor of DiMare. Doc. 123, Part 3, Reparation Order, at 13.

As an initial matter, the Reparation Order focuses on the term "product shortage."  Sun Pacific provided some briefing supporting its argument that the heat constituted an Act of God. See Doc. 127, Sun Pacific's Opposition, at 17:16-19.  DiMare deals solely with the term "product shortage" and does not argue that the heat experienced in the summer of 2006 was not an Act of God. See Doc. 118, Part 2, DiMare's Brief and Doc. 133, DiMare's Reply.  The court accepts that issue as uncontested between the parties.  There is a body of common law that interprets Act of God clauses, also called force majeure clauses.  Where the "terms were specifically bargained for by both parties...the 'doctrine' of force majeure should not supersede the specific terms bargained for in the contract." Perlman v. Pioneer Partnership, 918 F.2d 1244, 1248 (5th Cir. 1990).  Sun Pacific argues that the term "product shortage" should be interpreted as a trade usage. Doc. 127, Sun Pacific's Opposition, at 18:1-18.  However, neither party argues that the body of common law on Act of God should be applied.  Instead, the parties appear to agree that "Under California contract law, the court must endeavor to effectuate the mutual intent of the parties. The paramount consideration is the parties' objective intention at the time of contracting." Wolsey, Ltd. v. Foodmaker, Inc., 144 F.3d 1205, 1210 (9th Cir. 1998), citations omitted.

"Under California law, the interpretation of a written contract is a matter of law for the court even though questions of fact are involved." Southland Corp. v. Emerald Oil Co., 789 F.2d 1441, 1443 (9th Cir. 1986).  "Summary judgment is appropriate when the contract terms are clear and unambiguous, even if the parties disagree as to their meaning. Interpretation of a contract is a matter of law, including whether the contract is ambiguous." United States v. King Features Entertainment, Inc., 843 F.2d 394, 398 (9th Cir. 1988), citations omitted. "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Cal. Civ. Code §1636.

California recognizes two forms of ambiguity: patent and latent.  Patent ambiguity

appears on the face of the text itself while latent ambiguity arises from extrinsic evidence that casts doubt on the plain meaning of the text. See Supervalu, Inc. v. Wexford Underwriting Managers, Inc., 175 Cal. App. 4th 64, 73-74 (Cal. App. 2d Dist. 2009). "California has a liberal parol evidence rule: It permits consideration of extrinsic evidence to explain the meaning of the terms of a contract even when the meaning appears unambiguous." Foad Consulting Group v. Musil Govan Azzalino, 270 F.3d 821, 826 (9th Cir. 2001). "[E]ven if the written agreement of the parties is clear and unambiguous on its face, the trial judge must consider relevant extrinsic evidence that can prove a meaning to which the language of the contract is reasonably susceptible. However, if after considering extrinsic evidence the court finds the language of the contract is not reasonably susceptible to the asserted interpretation and is unambiguous, extrinsic evidence cannot be received for the purpose of varying the terms of the contract." United States v. King Features Entertainment, Inc., 843 F.2d 394, 398 (9th Cir. 1988), citations omitted. "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible. A rule that would limit the determination of the meaning of a written instrument to its four-corners merely because it seems to the court to be clear and unambiguous, would either deny the relevance of the intention of the parties or presuppose a degree of verbal precision and stability our language has not attained." Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co., 69 Cal. 2d 33, 37 (Cal. 1968). "[T]he meaning of language is to be found in its applications. An indeterminacy in the application of language signals its vagueness or ambiguity. An ambiguity arises when language is reasonably susceptible of more than one application to material facts. There cannot be an ambiguity per se, i.e. an ambiguity unrelated to an application. Accordingly, even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible." Dore v. Arnold Worldwide, Inc., 39 Cal. 4th 384, 391 (Cal. 2006), citations omitted. For latent ambiguity to exist, the text must be reasonably susceptible to an interpretation (supported by extrinsic evidence) that is at odds with the plain

1    meaning of the text.

2    A "shortage" is defined as "a deficiency in an amount required." Webster's Third New

3    Int'l Dictionary 2102 (Philip Babcock Gove et al eds. 2002).  While this definition tends to

4    support DiMare's position, the term is at least susceptible to Sun Pacific's interpretation.

5    DiMare relies on the statements of Sam Licato: "Q. In this contract there is a paragraph 6, which

6    is what this dispute is regarding. Did you ever discuss that paragraph with Tom Valenzuela when

7    you were negotiating this contract? A. I'm sure I did. But I don't remember that long ago whether

8    we had a hard long discussion. I don't think it was anything significant. Q. Did you at that time

9    give Tom Valenzuela your interpretation of what that provision meant? A. Yes, I did. I told him

10   that, if they packed tomatoes, I expected to get the tomatoes that I contracted as long as they have

11   them; that if, in fact, they did not pack tomatoes, that I did not expect them to go out and buy

12   them to fill the orders. Q. And that is specifically what you told him? A. That is specifically what

13   I told him. Q. When you were negotiating the contract? A. That is correct." Licato Deposition, at

14   9:21-10:13.  Tom Valenzuela has provided an affidavit that states, "In negotiating the agreement,

15   Sam Licato and I had several discussions about the quantity, size and price terms of the

16   contract....I drafted the Contract using a form Sun Pacific and DiMare had used for the 2005

17   season and Sun Pacific previously obtained from another tomato shipper. Sam Licato and I did

18   not discuss or negotiate the shortage provision found in paragraph 6 of the Contract - either

19   before or after the Contract was signed. Sam Licato never communicated to me of [sic] his

20   understanding of paragraph 6 of the contract....I understood the term 'product shortage' to mean

21   that Sun Pacific's actual tomato yields were less than its projected yields." Doc. 126, Ex. A,

22   Valenzuela Affidavit, at 2:2-20.

23   This is a clear factual dispute which precludes summary judgment.  Sun Pacific also

24   argues that the USDA ALJ used an incorrect theory of damages in arriving at the amount

25   awarded to DiMare.  As DiMare's motion for summary judgment is being denied on the issue of

26   liability, damages need not be addressed at this time.

27

28   **C. Provisional Agreement**

On August 31, 2006, Sam Licato and Tom Gilardi spoke on the phone and came to some form of agreement (the Provisional Agreement) for Sun Pacific to send tomatoes to DiMare. "That same day, Sam Licato faxed DiMare's order sheet for the week of September 4-9 at the Contract prices. The following day, on September 1, Tom Gilardi crossed out the prices and wrote 'market price' and 'let me know'; and faxed the order sheet asking DiMare to confirm the price, then faxed it back to DiMare. Sam Licato did not object in writing to the prices in Tom Gilardi's September 1 fax, and proceeded with those sales between September 5 and 9. On September 8, Sam Licato sent the order sheet for the week of September 11 to Sun Pacific listing the price as the market price. Sun Pacific accepted those orders on September 9." Doc. 119, Part 4, Sun Pacific's Undisputed Facts 30, 31, 33, and 37 (generally undisputed by DiMare).

Sun Pacific argues that the Provisional Agreement constitutes a modification of the Original Contract and such modification would "render[] the remaining issues regarding the terms of the [O]riginal Contract moot." Doc. 134, Sun Pacific's Reply, at 3:9-12.  It does not appear that the Secretary made any findings regarding the Provisional Agreement but that is not a bar to examination of the issue on appeal.  "[A] party to a PACA appeal may raise arguments in the district court that were not presented in the hearing before the Secretary." Procacci Bros. Sales Corp. v. Frank's Distrib. of Produce, LLC, 2009 U.S. Dist. LEXIS 42671 (D. Ariz. Apr. 6, 2009).  Modification of a contract for sale of goods is governed by Cal. Com. Code §2209 which provides in relevant part that modification does not require consideration but does require the statute of frauds to be satisfied. "[A] valid modification still requires proof of the other elements essential to the validity of a contract, including mutual assent." Comerica Bank v. Whitehall Specialties, Inc., 352 F. Supp. 2d 1077, 1081 (C.D. Cal. 2004), quoting Pmc, Inc. v. Porthole Yachts, 65 Cal. App. 4th 882, 887 (Cal. App. 4th Dist. 1998).

DiMare argues that "Sun Pacific admits it put an end to the contract when it invoked the Act of God clause. As a result, there was no contract to modify. Furthermore, the essence of the contract was the supply of the tomatoes at the contract price. When Sun Pacific refused to provide the tomatoes at the contract price the contract was terminated, and this is what Sun Pacific's General Manager frankly admitted when he stated the contract was terminated and

1  DiMare would be treated like any other open market customer." Doc. 123, Part 1, DiMare's

2  Opposition, at 7:1-6, emphasis in original.  DiMare offers no support for the proposition that a

3  contract one party has (allegedly) terminated can no longer be modified.  Parties can modify

4  contracts after they are breached. See <u>Unitec Corp. v. Beatty Safway Scaffold Co.</u>, 358 F.2d 470,

5  473-75 (9th Cir. 1966) (affirming trial court's finding of oral modification after breach; based on

6  Oregon law).  In this case, there does not even appear to be any interruption in the actual delivery

7  of tomatoes between the time of alleged "termination" and alleged "modification."

8       However, the evidence concerning the discussions that arrived at the Provisional

9  Agreement is not clear cut.  The key factor is a telephone conversation between Sam Licato and

10  Tom Gilardi on August 31, 2006.  In discussing the conversation, Sam Licato said, "I sent him

11  that letter, and explained to him that - that he had me over a barrel, I needed the tomatoes, so that

12  I would take the tomatoes, but I would - I did not agree with the act of God and did not accept the

13  fact that he wasn't going to fulfill his obligations under the contract" and "I told him I didn't

14  agree with the contract but I needed the tomatoes and, 'if you're going to bill me that price, you

15  have to do what you have to do, but I do not agree that we are not in a contract situation, but I

16  need the tomatoes.'" Hearing Transcript, at 143:7-13 and 245:13-18.  In the deposition, he said,

17  "they had already told me they were going to call an act of God. And I told them that I wasn't

18  accepting that. Okay. But that if they needed market tomatoes to get me the tomatoes, that I

19  would take the tomatoes at market price, and we would determine at a later time whether or not I

20  would pay the market price or not. I told Tom Gilardi that." Licato Deposition, at 31:4-10.  Tom

21  Gilardi's version of the conversation is that "we talked about it and I said, 'I'll supply you, give

22  you as much tomatoes as I can at the contract- you know, at the regular price, the market price

23  until this thing lightened up, maybe October or something and maybe we can get back on to the

24  contract situation.' Q. Did he agree to that? A. Yeah." Hearing Transcript, at 352:8-16.  The next

25  day  Sam Licato sent a letter to Tom Gilardi which is ambiguous and includes the phrase "I

26  would expect once production is close to or normal supplies [sic] the contract to start

27  again....please send me a letter from Sun Pacific stating your reason for calling the 'Act of God'

28  and your assurance once conditions are normal or close to normal, you will resume the contract."

1   Doc. 120, Part 12, September 1, 2006 Letter.  The parties agree that Sam Licato and Tom Gilardi

2   went back and forth on the pricing in the order sheets.

3           "A party that with explicit reservation of rights performs or promises performance or

4   assents to performance in a manner demanded or offered by the other party does not thereby

5   prejudice the rights reserved. Such words as 'without prejudice,' 'under protest,' or the like are

6   sufficient." Cal. Com. Code §1308 (applies to Cal. Com. Code §2209 modification by way of

7   Cal. Com. Code §1102).  California's law derived from and identical to U.C.C. §1-308 whose

8   comment states, "This section provides machinery for the continuation of performance along the

9   lines contemplated by the contract despite a pending dispute, by adopting the mercantile device

10  of going ahead with delivery, acceptance, or payment 'without prejudice,' 'under protest,' 'under

11  reserve,' 'with reservation of all our rights," and the like. All of these phrases completely reserve

12  all rights within the meaning of this section. The section therefore contemplates that limited as

13  well as general reservations and acceptance by a party may be made 'subject to satisfaction of our

14  purchaser,' 'subject to acceptance by our customers,' or the like."  The code provision is rarely

15  cited, but in at least one case involving a sales contract, the seller who continued to make

16  deliveries under protest to a buyer who breached reserved the rights to sue for breach of the

17  underlying contract. Shea-Kaiser-Lockheed-Healy v. Department of Water & Power, 73 Cal.

18  App. 3d 679, 690 (Cal. App. 2d Dist. 1977) ("As previously noted, however, such delivery was

19  expressly made under protest and with an explicit reservation of rights. It therefore did not

20  prejudice any of the rights reserved by [seller], including the right to sue [buyer] in damages for

21  this breach").  The importance of reserving objections is echoed in other parts of relevant

22  California law: "Where the contract for sale involves repeated occasions for performance by

23  either party with knowledge of the nature of the performance and opportunity for objection to it

24  by the other, any course of performance accepted or acquiesced in without objection shall be

25  relevant to determine the meaning of the agreement." Cal. Com. Code §2208 (repealed Stats

26  2006 ch. 254 §34, effective January 1, 2007)  One commentator even suggests that "To the

27  extent that the protest is given effect under common law or statute, it is obvious that there will be

28  occasions when the coercing party will insist that the protest be withdraw. Under such

1    circumstances a withdrawn protest should act as a protest." 2 Arthur Linton Corbin, Corbin on

2    Contracts, §7.21 at 480 (Joseph M. Perillo et al. eds., revised ed. 1995).

3        DiMare, through Sam Licato, clearly agreed to take shipment of tomatoes.  Whether that

4    was pursuant to a modification of the Original Contract to reset the prices to the then prevailing

5    market rates or an agreement with reservation of rights under the Original Contract is not clear.

6    Sam Licato's statements are ambiguous but they suggest that he may have accepted the market

7    price under protest and reservation of DiMare's rights under the Original Contract.  Tom

8    Gilardi's statement is also ambiguous.  There is a factual dispute as to what Sam Licato actually

9    agreed to over the phone in arranging the Provisional Agreement which precludes summary

10   judgment.

11

12   **F. Defective Shipments**

13       In the Reparation Proceeding, DiMare claimed that two shipments of tomatoes (invoiced

14   July 28 and September 2) contained defects.  The USDA ALJ determined that DiMare did not

15   notify Sun Pacific of the alleged defects in a timely manner and so was not entitled to damages.

16   Doc. 123, Part 3, Reparation Order, at 18.  The court assumes that these shipments are the five

17   purchase orders referred to in counts three and four of DiMare's counterclaim. See Doc. 16,

18   Answer and Counterclaim, at 7:7-22.  In this summary judgment motion, DiMare does not

19   challenge the Reparation Order on this point.  The court assumes that DiMare is abandoning its

20   claims with respect to the allegedly defective shipments.

21

22   **E. Clarifying the Record**

23       As part of its motion for partial summary judgment, Sun Pacific sent a binder of

24   documents to the court that contained courtesy copies of its filings.  That binder includes docket

25   entries 119, (with exhibits), 120 (with exhibits), and 121.  Also included in the binder are what

26   appear to be full deposition transcripts of Sam Licato on May 11, 2010; Dennis Gregory on May

27   12, 2010; Michael Spinnazzola on May 12, 2010; Eric Janke on February 17, 2010; and Paul

28   DiMare on February 26, 2010; as well as the full transcript of the hearing on December 11-12,

1  2007.  These documents were not filed in the docket; there is no entry that reflects the fact they

2  were provided in support of Sun Pacific's motion for summary judgment.  The court has

3  ascertained through telephone contact with both parties' counsels that the depositions and

4  hearing transcript were sent by Sun Pacific to DiMare as part of the motion.

5      Local Rule 250.1 states, "Depositions taken orally or by written question...and related

6  documents shall not be filed unless and until there is a proceeding in which the document or

7  proof of service is at issue. Before or upon the filing of a document making reference to a

8  deposition, counsel shall comply with L.R. 133(j)."  Local Rule 133(j) states, "Depositions shall

9  not be filed through CM/ECF. Before or upon the filing of a document making reference to a

10  deposition, counsel relying on the deposition shall ensure that a courtesy hard copy of the entire

11  deposition so relied upon has been submitted to the Clerk for use in chambers. Alternatively,

12  counsel relying on a deposition may submit an electronic copy of the deposition in lieu of the

13  courtesy paper copy to the emailbox of the Judge or Magistrate Judge and concurrently email or

14  otherwise transmit the deposition to all other parties. Neither hard copy nor electronic copy of the

15  entire deposition will become part of the official record of the action absent order of the Court.

16  Pertinent portions of the deposition intended to become part of the official record shall be

17  submitted as exhibits in support of a motion or otherwise."

18      Sun Pacific, in trying to simultaneously follow the directive not to file a deposition in

19  CM/ECF and submitting them as exhibits in support of its motion, provided these documents to

20  the court and DiMare but did not file them in the docket.  This appears to be an honest mistake in

21  response to arguably ambiguous wording in the Local Rules.  Upon filing of the present order,

22  the court will give the binder to the Clerk of the Court to be lodged as part of this case.

23

24                              **V. Order**

25      DiMare's motion for summary judgment is DENIED.

26      Sun Pacific's motion for summary judgment is DENIED.

27      The pretrial conference is reset from August 26, 2010 to 8:30 AM on September 22,

28  2010.  The parties are directed to comply with Local Rule 281 and file a joint pretrial statement.

Personal appearance is required at the pretrial conference.

The bench trial is reset from October 19, 2010 to 8:30 AM on November 9, 2010 in courtroom 2.  This will be de novo trial in accordance with 7 U.S.C. §499g(c).

IT IS SO ORDERED.

Dated:    August 13, 2010

_____

CHIEF UNITED STATES DISTRICT JUDGE