**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SUN PACIFIC MARKETING COOPERATIVE, INC., | ) CIV-F-06-1404 AWI GSA ) |
| Appellant, | ) ) FINDINGS OF FACT AND |
| v. | ) CONCLUSIONS OF LAW ) |
| DIMARE FRESH, INC., | ) ) |
| Appellee. | ) ) |

The matter before the court is an appeal.  Both Plaintiff-Appellant Sun Pacific Marketing Cooperative, Inc. ("Sun Pacific") and Defendant-Appellee DiMare Fresh, Inc. ("DiMare") filed suit in the Eastern District of California alleging breach of contract.  DiMare then dropped its suit and filed a complaint with the U.S. Department of Agriculture under 7 U.S.C. §499f of the Perishable Agricultural Commodities Act ("PACA").  This present federal case was stayed pending the outcome of the U.S. Department of Agriculture proceeding ("PACA Hearing").  Administrative Law Judge William Jenson found in favor of DiMare, awarding $1,136, 599 in damages, plus $43,930.97 in attorney's fees and costs, plus interest.  Sun Pacific appealed the decision, which was merged with Sun Pacific's preexisting suit.  Though the case is technically an appeal, the trial is undertaken on a de novo basis.

1

**I. Findings of Fact**

1.    Sun Pacific is a produce company which grows, packs, and ships fresh tomatoes (among other agricultural products) in the San Joaquin Valley.  DiMare is a repacker of tomatoes, which purchases and repacks fresh tomatoes for sale to restaurants and retailers.

2.    In July 2006, Sun Pacific contracted to sell tomatoes to DiMare from July 17 through October 31, 2006 on a weekly basis, free on board from Sun Pacific's facility in Exeter, CA ("Contract").  The Contract called for the sale of six distinct categories of tomatoes at fixed prices and quantities.  The specific varieties of tomato, quantities per week, and price specified in the Contract to are as follows:

|  | Loads | Boxes | Price |
|---|---|---|---|
| Medium Round 6x7 #1 grade | 2.5 | 4,000 | $5.45 |
| Medium Round 6x7 #2 grade | 2.5 | 4,000 | $4.45 |
| Large Round 6x6 #1 grade | 2.5 | 4,000 | $6.45 |
| Large Round 6x6 #2 grade | 2.5 | 4,000 | $5.45 |
| Jumbo Round 5x5 (or St. Regis 5x5) | 2 | 3,200 | $7.95 |
| Medium Roma | 2 | 3,200 | $7.35 |

One load is equal to 1,600 boxes (or cartons).  5x5, 6x6, and 6x7 refer to tomato sizes. Tomatoes are graded; those of a sufficient quality are termed #1.  A #1 grade load contains a minimum of 85% #1 tomatoes; a #2 grade load only contains a minimum of 60% #1 tomatoes. Trial Transcript, at 22:17-19.  Sun Pacific markets #1 tomatoes as Airchiefs and #2 tomatoes as Stardusts; the exhibits do not label the loads as #1 and #2. Plaintiff's Exhibit 29.  The Rounds were to be tomatoes that were picked when green.  St. Regis tomatoes are pink tomatoes that have begun to ripen on the vine. Trial Transcript, at 30:9-19.  The terms Airchief, Stardust, and St. Regis are marketing names used by Sun Pacific; other growers use different marketing names for different grades and different color tomatoes.  The listed prices include $1.45 for palletization. Trial Transcript, at 33:13-24.  The Contract was not for tomatoes in general but for specific volumes at specific prices of these six categories of tomatoes. Trial Transcript, at 56:25-57:5.

3.   The Contract also contained a provision which states "6. Shippers' obligation. In the event of a product shortage caused by an Act of God, Natural disaster or other incident that could not be foreseen and is beyond the control of Sun Pacific, then performance under this contract shall be excused." Joint Exhibit 1.   The parties ended up in a dispute over this clause of the Contract which affected sales from the week of 9/4-9/10 through 10/30-10/31.

4.   The Contract was negotiated between DiMare's sales representative, Sam Licato, and Sun Pacific's sales representative, Tom Valenzuela.   It was then signed by Mr. Licato and Al Bates, general manager of Sun Pacific.   Mr. Valenzuela drafted the Contract borrowing the language of a contract between Sun Pacific and DiMare in 2005. Trial Transcript, at 131:11-17.   Mr. Valenzuela testified that during the course of negotiating the Contract, he and Mr. Licato did not discuss the meaning of the term "product shortage." Trial Transcript, at 127:14-18.   Mr. Licato testified that during the course of negotiating the Contract, he let Mr. Valenzuela know that DiMare expected to get tomatoes if Sun Pacific had them packed from its fields. Trial Transcript, at 35:15-36:5.   These testimonies appear to contradict each other.   Mr. Valenzuela was not a witness at the PACA Hearing. In that proceeding, Mr. Licato was not asked about any communication between the parties concerning the term "product shortage" during the negotiation of the Contract. Cf. PACA Hearing Transcript, at 228:20-229:1 and 256:5-22 (Mr. Licato states what he believed the term meant at the time the Contract was negotiated, but was not asked if he informed Mr. Valenzuela of his interpretation).   On this point, the court credits Mr. Licato's testimony.

5.   On a day to day basis, Mr. Licato dealt with Mr. Valenzuela until early August, when Mr. Valenzuela left Sun Pacific's employment. Trial Transcript, at 130:13-18.   After Mr. Valenzuela left, Mr. Licato dealt with Tom Gilardi, Sun Pacific's sales representative, to arrange the shipments under the Contract. PACA Hearing, at 342:17-343:3.   For a week's shipments, Mr. Licato and Mr. Gilardi would discuss the matter the prior week.   Mr. Licato would fill out an order sheet, specifying the category, quantity, price, and specific

day he wanted the shipments to be available for pickup. Trial Transcript, at 343:6-344:6.
He would normally fax that order to Mr. Gilardi on the Thursday. Trial Transcript, at
59:22-24.  Mr. Gilardi would then send the form back with pick-up numbers for the
requested loads to finalize the arrangement. Trial Transcript, at 50:13-24.  Afterwards,
Sun Pacific sent DiMare invoices for the shipments.

6.      The tomato crop was affected by a heat wave during the contract period.  The heat
decreased the number of tomatoes harvested.  Trial Transcript, at 158:13-22.  Further,
some of the harvested tomatoes were of a faulty quality and so were not packed for sale.
Trial Transcript, at 158:23-159:10.  Packed tomatoes are available for shipment to buyers.
From early in the contract period, Sun Pacific was not able to pack sufficient tomatoes of
certain categories to fulfill the quantities of the Contract.  Mr. Licato admitted that there
were weeks when Sun Pacific was not able to pack enough tomatoes of a specific size
and/or grade to meet the requirements of the Contract. Trial Transcript, at 39:13-40:14.

7.      Mr. Bates testified that Defendant's Exhibit B represents what was actually sold by Sun
Pacific to DiMare over a number of weeks in 2006. Trial Transcript, at 175:20-176:2.  A
partial record of the boxes of tomatoes actually shipped shows that the parties did not
follow the categories and quantities specified by the Contract:

|  | Medium Round 6x7 #1 grade | Medium Round 6x7 #2 grade | Large Round 6x6 #1 grade | Large Round 6x6 #2 grade | Jumbo Round 5x5 | Extra Large 5x6 | Large Roma |
|---|---|---|---|---|---|---|---|
| 7/31-8/6 | 6,800 | 1,200 | 7,360 | 640 | 3,200 | 0 | 1,520 |
| 8/7-8/13 | 4,800 | 1,520 | 2,240 | 2,320 | 1,680 | 1,520 | 3,200 |
| 8/14-8/20 | 6,000 | 960 | 2,880 | 1,840 | 2,227 | 843 | 1,600 |
| 8/21-8/27 | 5,200 | 1,120 | 3,840 | 960 | 2,400 | 800 | 3,200 |
| 8/28-9/3 | 5,840 | 560 | 3,920 | 880 | 1,040 | 2,160 | 3,200 |

Defendant's Exhibit B.  It appears that the shipments for each week were separately
negotiated between Mr. Licato and Mr. Gilardi (or Mr. Valenzuela).

8.      The Contract specifically permitted the substitution of St. Regis tomatoes for Jumbo

4

Round 5x5 tomatoes.  Mr. Licato and Mr. Valenzuela agreed that Sun Pacific could not make any other substitutions (of variety, size, and/or quality) without DiMare's express approval. Trial Transcript, at 30:20-22 and 130:3-12.  Conversely, Mr. Licato agreed that, based on his understanding of what the Contract meant, Sun Pacific did not have to offer any substitutions. Trial Transcript, at 37:14-15.  When Sun Pacific did not produce enough of a category of tomato to fulfill the Contract amounts, Mr. Licato says he permitted Sun Pacific to make up the amounts at a later date, but agreed that Sun Pacific could not unilaterally be short without his permission. Trial Transcript, at 39:10-40:14. Mr. Valenzuela agreed that Sun Pacific could not substitute tomatoes or change the quantities without DiMare's permission. Trial Transcript, at 125:1-8; Trial Transcript, at 130:3-12.

9.    In the course of performing the Contract, the parties made several modifications.  Mr. Licato allowed Sun Pacific to substitute Extra Large Round 5x6 tomatoes for Jumbo Round 5x5 tomatoes, but agreed that Sun Pacific did not have to under the Contract. Trial Transcript, at 37:5-15.  The records of tomatoes shipped shows that Sun Pacific also sold more Medium Round 6x7 #1 grade tomatoes than was required by the Contract and fewer Medium Round 6x7 #2 tomatoes.  Similarly, more Large Round 6x6 #1 grade tomatoes were shipped and fewer Large Round 6x6 #2 grade tomatoes were shipped. Defendant's Exhibit B.  Mr. Licato stated Sun Pacific was substituting some #1 grade tomatoes for #2 grade tomatoes early in the contract period. Trial Transcript, at 77:13-15.

10.    The parties modified the Contract to reduce the number of Large Round 6x6s. Trial Transcript, at 27:10-16.  From the week of 8/8-8/13 through the end of the contract period the number of Large Round 6x6 #1 grade and #2 grade tomatoes required was each decreased from 2.5 loads to 1.5 loads (4,000 boxes to 2,400 boxes).  The parties also substituted Large Roma tomatoes in place of Medium Roma tomatoes. Defendant's Exhibit B.  In fact, there is no evidence in the record that Sun Pacific ever sold DiMare any Medium Roma tomatoes.  The weekly order sheets for 8/21-8/27 and 8/28-9/3 (the weeks before the dispute began) sent by Mr. Licato to Mr. Gilardi reflect the following

5

categories, quantities, and prices:

|  | Loads | Boxes | Price |
|---|---|---|---|
| Medium Round 6x7 #1 grade | 2.5 | 4,000 | $5.45 |
| Medium Round 6x7 #2 grade | 2.5 | 4,000 | $4.45 |
| Large Round 6x6 #1 grade | 1.5 | 2,400 | $6.45 |
| Large Round 6x6 #2 grade | 1.5 | 2,400 | $5.45 |
| Jumbo Round 5x5 (or St. Regis 5x5) | 2 | 3,200 | $7.95 |
| Large Roma | 2 | 3,200 | $7.35 |

Joint Exhibit 2. The weekly order sheets for 9/4-9/10 and 9/11-9/17 also reflect these categories and quantities (but not prices). Joint Exhibit 4 and 8. The order sheets for 8/21-8/27 and 8/28-9/3 only show what Mr. Licato requested; it does not show Mr. Gilardi's response. Defendant's Exhibit B demonstrates that the categories and quantities actually shipped do not correspond to Mr. Licato's requests:

|  | Medium Round 6x7 #1 grade | Medium Round 6x7 #2 grade | Large Round 6x6 #1 grade | Large Round 6x6 #2 grade | Jumbo Round 5x5 | Extra Large 5x6 | Large Roma |
|---|---|---|---|---|---|---|---|
| 8/21-8/27 | 5,200 | 1,120 | 3,840 | 960 | 2,400 | 800 | 3,200 |
| 8/28-9/3 | 5,840 | 560 | 3,920 | 880 | 1,040 | 2,160 | 3,200 |

The specific details of how Mr. Gilardi and Mr. Licato negotiated these shipments has not been presented. The parties have not provided Mr. Gilardi's response to these weekly order sheets with pick-up numbers filled in. Overall, Mr. Licato did say that he got all of the tomatoes he requested before the dispute. Trial Transcript, at 55:11-12.

11.     The parties' dispute began with the shipments for 9/4-9/10. On August 31, 2006, Mr. Gilardi forwarded an e-mail to Mr. Licato; the e-mail was between third parties and explained that a grower was canceling its tomato contracts due a 50% decrease in tomato yields in its facilities in Virginia and California. Joint Exhibit 3; Trial Transcript, at 46:7-47:9. Mr. Gilardi and Mr. Licato then talked on the phone that same day. Mr. Gilardi told Mr. Licato that Sun Pacific would be invoking a product shortage under the Contract.

PACA Hearing, at 350:4-14.  On the phone, Mr. Licato requested a formal letter. Trial Transcript, at 49:23-50:5.  During the August 31 conversation, Mr. Gilardi said that Mr. Licato disagreed with Sun Pacific's reasons for invoking a product shortage, but did agree to buy tomatoes at market prices. PACA Hearing, at 351:19-353:16.  Mr. Licato sent Mr. Gilardi a letter dated September 1 which requested Sun Pacific give a formal rationale for invoking a product shortage: "Tom please send me a letter from Sun Pacific stating your reason for calling the 'Act of God' and your assurance once conditions are normal or close to normal, you will resume the contract signed by both yourself and DiMare Fresh, Inc.  We need this letter today September 1, 2006, if you could show us some proof that supplies at Sun Pacific are in fact 50% less than normal." Joint Exhibit 5; Trial Transcript, at 54:1-5.  Mr. Bates sent a letter to Mr. Licato dated September 4, 2006 in which Sun Pacific formally invoked a product shortage due to an Act of God. Joint Exhibit 6.

12.     Mr. Licato sent the weekly order sheet for 9/4-9/10 to Mr. Gilardi on August 31 and Mr. Gilardi sent it back on September 1. Trial Transcript, at 52:2-12.  Mr. Licato filled in the sheet with Contract prices and Mr. Gilardi sent it back with those prices struck out and the words "market price let me know." Joint Exhibit 4.  On the weekly order sheet for 9/11-9/17, Mr. Licato requested 12 loads of tomatoes and in the cost box, he wrote "market." Joint Exhibit 8.  He sent the fax to Mr. Gilardi on September 8, 2006. Trial Transcript, at 60:9-11.

13.     Mr. Licato stated that he repeatedly told Mr. Gilardi, starting on September 1, 2006, that DiMare did not accept the sale of tomatoes at market price and that the dispute would have to be settled through PACA. Trial Transcript, at 67:17-68:6 and 79:23-80:7.  He said "I never agreed to pay the market price except - because I couldn't get the tomatoes if I didn't say that. But I also told him that we would be going to PACA because I disagreed with it. That's what I Told Tom Gilardi." Trial Transcript, at 79:8-11.  On this point, the court credits Mr. Licato's testimony.

14.     DiMare's attorneys sent Sun Pacific a letter dated September 12, 2006 in which DiMare

formally rejected Sun Pacific's invocation of a product shortage due to an Act of God.

Joint Exhibit 10.  For the shipments of 9/4-9/10 and 9/11-9/17, Sun Pacific invoiced

DiMare market prices, but DiMare only paid Sun Pacific the contract prices. Trial

Transcript, at 194:23-195:6.  On September 13, 2006, Mr. Gilardi informed Mr. Licato

that if DiMare was not going to pay market prices, then Sun Pacific would not longer

supply DiMare. Trial Transcript, at 114:15-22.  As DiMare refused, Sun Pacific stopped

shipping. Trial Transcript, at 214:15-18.

15.     Mr. Bates testified that Plaintiff's Exhibits 28 and 29 show the number of boxes Sun

Pacific packed each week. Trial Transcript, at 164:20-165:8 and 186:18-187:5.  The

following tables show the number of boxes Sun Pacific packed each week in six

categories of tomatoes.

| | Medium Round 6x7 #1 grade | Medium Round 6x7 #2 grade | Large Round 6x6 #1 grade | Large Round 6x6 #2 grade | Jumbo Round 5x5 plus St. Regis 5x5 | Large Roma |
|---|---|---|---|---|---|---|
| 7/17-7/23 | 22,738 | 2,751 | 46,335 | 5,030 | 14,753 | 27,680 |
| 7/24-7/30 | 7,908 | 866 | 25,205 | 2,584 | 19,275 | 18,080 |
| 7/31-8/6 | 15,440 | 1,258 | 32,756 | 3,800 | 14,082 | 6,787 |
| 8/7-8/13 | 22,480 | 2,240 | 33,638 | 3,120 | 6,577 | 9,828 |
| 8/14-8/20 | 5,297 | 640 | 10,817 | 1,160 | 2,919 | 5,472 |
| 8/21-8/27 | 5,647 | 911 | 9,888 | 1,320 | 4,113 | 6,525 |
| 8/28-9/3 | 18,000 | 1,775 | 24,444 | 2,402 | 7,107 | 12,429 |
| 9/4-9/10 | 15,320 | 1,067 | 22,297 | 1,405 | 4,279 | 6,032 |
| 9/11-9/17 | 30,560 | 1,760 | 24,569 | 1,591 | 2,807 | 1,123 |
| 9/18-9/24 | 37,466 | 2,000 | 26,400 | 1,360 | 1,023 | 872 |
| 9/25-10/1 | 27,863 | 3,144 | 27,224 | 2,681 | 257 | 558 |
| 10/2-10/8 | 11,449 | 734 | 16,774 | 896 | 1,962 | 1,767 |
| 10/9-10/15 | 35,061 | 3,763 | 43,870 | 4,439 | 5,653 | 6,378 |
| 10/16-10/22 | 21,274 | 0 | 32,061 | 0 | 4,391 | 3,293 |
| 10/23-10/29 | 13,802 | 0 | 31,075 | 0 | 8,200 | 11,097 |

| 10/30-10/31 | 3,280 | 0 | 18,106 | 0 | 3,548 | 13,764 |
|---|---|---|---|---|---|---|

Plaintiff's Exhibits 28 and 29.

16.   However, on the weekly order sheet for 9/4-9/10, Mr. Gilardi represented that Sun Pacific could sell DiMare (at market prices) 4,000 boxes of Medium Round 6x7 #2 grade tomatoes and 2,400 boxes of Large Round #2 grade tomatoes. Joint Exhibit 4.  Mr. Gilardi provided pick-up numbers for those requests, indicating that they were available for DiMare to pick up on the dates specified.  This contradicts Sun Pacific's exhibits which shows that only 1,067 boxes of Medium Round 6x7 #2 grade tomatoes and 1,405 boxes of Large Round 6x6 #2 grade tomatoes were packed that week. Plaintiff's Exhibit 29.  No party has explained this discrepancy.

17.   Similarly, the weekly order sheet for 9/11-9/17 shows that Mr. Gilardi agreed to ship certain quantities of tomatoes, though the packing records show that lesser quantities were packed. Joint Exhibit 8; Plaintiff's Exhibit 28; Plaintiff's Exhibit 29.  While Mr. Gilardi did put in some question marks to indicate that Sun Pacific might not have sufficient Medium Round 6x7 #2 grade tomatoes and Large Round 6x6 #2 grade tomatoes to fulfill the order, he represented that Sun Pacific could fulfill the quantities requested of the other categories tomatoes. Trial Transcript, at 60:20-61:7; Joint Exhibit 8.  Particularly troubling, Mr. Gilardi represented that DiMare could pick up 3,200 boxes of Large Roma tomatoes while Sun Pacific only packed 1,123 boxes that week. Joint Exhibit 8; Plaintiff's Exhibit 28, at 9.  No party has explained this discrepancy.

18.   DiMare resold the tomatoes received from Sun Pacific.  In 2006, DiMare resold them to third parties Jack in the Box and IPC (the supplier for Subway), among others.  DiMare's contracts with these two restaurant chains included provisions for the renegotiation of prices if average prices as reported by the U.S. Department of Agriculture rose above a certain level. Plaintiff's Exhibits 18 and 20.

19.   DiMare purchased tomatoes from various sellers to substitute for the tomatoes it would have purchased from Sun Pacific under the Contract.  DiMare asserts it made 102

purchases from 9/4-9/10 through 10/30-10/31 to compensate for the cessation of the

Contract. Defendant's Exhibit A; Trial Transcript, at 306:9-12.  Included in these 102

purchases are ones from Sun Pacific over which the parties dispute pricing.  The other

purchases consisted of various tomatoes, some of which do not fit the six categories

specified in the Contract.  Eric Janke, vice president and CEO of DiMare, agreed that "if

the product is not a No. 2, or if its not the type found in the contract, it wouldn't be a

cover for that contract." Trial Transcript, at 316:19-22.  He later said that if the specific

type of tomato was not available, "we would have to purchase product with similar specs

or similar sizing to meet the customer standards." Trial Transcript, at 323:11-19.

However, Mr. Janke admitted that while he believed certain categories of tomato were

unavailable, he did not have personal knowledge of their unavailability. Trial Transcript,

at 324:3-325:13.  Mr. Licato did state in his declaration (admitted into evidence by the

Pretrial Order, Doc. 149, at 20:6-8) that at the time, there was a "lack of replacement

'cover' goods" in the general marketplace. Plaintiff's Exhibit 7, at 1. Again, the court

credits Mr. Licato's statement.

## II. Conclusions of Law

### A. Legal Standard

In an appeal under PACA, "suit in the district court shall be a trial de novo and shall

proceed in all respects like other civil suits for damages, except that the findings of fact and order

or orders of the Secretary shall be prima-facie evidence of the facts therein stated." 7 U.S.C.

§499g(c).  "Thus the party petitioning for an appeal of a reparation order had the burden of

production of evidence that rebuts the findings of fact by the Secretary." Procacci Bros. Sales

Corp. v. Frank's Distrib. of Produce, LLC, 2009 U.S. Dist. LEXIS 42671, *16 (D. Ariz. Apr. 6,

2009), citing Lee Loi Industries, Inc. v. Impact Brokerage Corp., 473 F.Supp.2d 566, 568

(S.D.N.Y. 2007).  The heart of the case is a breach of contract claim.  The substantive law

applied is California commercial law; PACA provides for the forum and procedure.

**B. Breach of Contract**

DiMare asserts Sun Pacific breached the Contract by refusing to ship tomatoes at Contract prices starting the week of 9/4-9/10.  Sun Pacific argues it was in full compliance with the Contract in invoking a "product shortage due to an Act of God."  More specifically, the parties disagree whether there was a "product shortage."

The difficulty with interpreting the Contract is that its terms were never fully performed by the parties.  The Contract specified sales quantities the parties never honored.  From the start, they treated the Contract as a framework for weekly negotiations as to the actual quantities of tomatoes to be sold.  It appears the parties sought to use the Contract to fix prices but not quantities.  With this background, the court will interpret the Contract as best as possible to give effect to its provisions.

**1. Meaning of "Product Shortage" Under the Contract**

Cal. Civ. Code §1649 states, "If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it."  The court can "consider how one party knew the other party understood the agreement." <u>Johnston v. Joint Highway Dist.</u>, 138 Cal. App. 450, 453 (Cal. App. 3rd Dist. 1934).  Mr. Licato informed Mr. Valenzuela during the negotiation of the Contract that DiMare expected the category of tomatoes to be delivered if Sun Pacific packed them.  The Contract language is reasonably susceptible to this interpretation.  Mr. Licato's statement governs how the term "product shortage" must be interpreted.  Thus, under the Contract, there was a "product shortage" of a category of tomato when Sun Pacific did not pack enough to fulfill the Contract quantities.

**2. Terms of the Contract at Time of Dispute**

While the terms of the Contract with regard to category, quantity, and price are clear, it is evident that the actual performance of the parties did not conform to those terms.  The fragmentary evidence provided shows the parties modified the Contract each and every week to

change the category and quantity of tomatoes shipped.  Sometimes, tomatoes that did not belong to any of the six categories contained in the Contract were shipped.  Thus, the shipments each week were unique, unlike the shipments the prior week or the subsequent week.  Insofar as the Contract is enforceable, these week to week changes can not be deemed to have permanently modified the Contract.  However, there appear to be three durable changes the parties agreed to that was meant to permanently change the terms of the Contract: 1) the number of Large Round 6x6 #1 grade tomatoes was reduced to 1.5 loads (2,400 boxes) starting the week of August 13, 2006; 2) the number of Large Round 6x6 #2 grade tomatoes was reduced to 1.5 loads (2,400 boxes) starting the week of August 13, 2006; and 3) Large Romas were to be used instead of Medium Romas for the entire duration of the Contract.  The parties agree that they explicitly modified the Contract to reduce the Large Round 6x6 #1 grade and #2 grade tomato quantities. The use of Large Roma tomatoes instead of Medium Roma tomatoes appears to have been implicitly agreed to by both parties though there is no direct testimony to that effect.  As far as the evidence shows, Sun Pacific never shipped any Medium Roma tomatoes to DiMare, only Large Roma tomatoes. Joint Exhibit 2; Joint Exhibit 4; Defendant's Exhibit B.  Sun Pacific has shown its intent that this be a permanent change to the Contract by referring to Large Roma tomatoes as contract tomatoes and by submitting Large Roma production figures in an attempt to show that there was a product shortage in a relevant category of tomato. Plaintiff's Exhibit 28. Sun Pacific has provided no production figures of Medium Roma tomatoes.  DiMare has shown its intent that this be a permanent change to the Contract by consistently claiming the purchase of Large Roma tomatoes is valid cover for the Medium Roma quantities. Defendant's Exhibit A.

At the time of the dispute through the end of the contract period, the Contract requirements are deemed to be:

|  | Loads | Boxes | Price |
|---|---|---|---|
| Medium Round 6x7 #1 grade | 2.5 | 4,000 | $5.45 |
| Medium Round 6x7 #2 grade | 2.5 | 4,000 | $4.45 |
| Large Round 6x6 #1 grade | 1.5 | 2,400 | $6.45 |

| Large Round 6x6 #2 grade | 1.5 | 2,400 | $5.45 |
| Jumbo Round 5x5 (or St. Regis 5x5) | 2 | 3,200 | $7.95 |
| Large Roma | 2 | 3,200 | $7.35 |

**3. Evidence of Product Shortage at Time of Dispute**

Sun Pacific is arguing that it did not pack sufficient quantities of the specified categories of tomatoes to satisfy the Contract. To show the deficiency, Sun Pacific presents Plaintiff's Exhibits 28 and 29 which report the number of boxes packed each week of the specified categories. However, there is contradictory evidence that strongly suggests Sun Pacific had more boxes for sale in certain weeks than the number of boxes packed. Sun Pacific does not explain this discrepancy. The court surmises that excess tomatoes in prior weeks might have been stored and made available when production from the fields was low or that the figures are inaccurate. Based on the evidence presented, the court must conclude that Plaintiff's Exhibits 28 and 29 do not show the number of boxes available to ship in any given week. Sun Pacific, as the party asserting a product shortage due to an Act of God, has the burden of proof to show the clause applies. San Mateo Cmty. College Dist. v. Half Moon Bay P'ship, 65 Cal. App. 4th 401, 414 (Cal. App. 1st Dist. 1998); see also Oosten v. Hay Haulers Dairy Employees & Helpers Union, 45 Cal. 2d 784, 788 (Cal. 1955) ("Impossibility of performance is a defense and the burden of proof in establishing it rests on defendant" asserting the defense). As Sun Pacific has not provided credible evidence to show any product shortage, there was no basis for invoking the Act of God clause.

**C. Modification and Reservation of Rights**

Sun Pacific argues in the alternative that starting August 31, 2006, the parties modified the Contract. That is, even if Sun Pacific was not entitled to invoke the Act of God clause, DiMare agreed to suspend performance of the Contract. The applicable law states "An agreement modifying a contract within this division needs no consideration to be binding....The

requirements of the statute of frauds section of this division (Section 2201) must be satisfied if the contract as modified is within its provisions." Cal. Com. Code §2209(1) and (3).  Section 2201 states "a contract for the sale of goods for the price of five hundred dollars ($500) or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his or her authorized agent or broker....Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subdivision (1) against the party unless written notice of objection to its contents is given within 10 days after it is received." Cal. Com. Code §2201(1) and (2).  On the telephone, Mr. Licato and Mr. Gilardi did agree that DiMare would purchase limited quantities of tomatoes at market prices.  This Modification was evidenced by the weekly order sheets for 9/4-9/10 and 9/11-9/17 which listed market prices. Joint Exhibits 4 and 8.

However, Mr. Licato did tell Mr. Gilardi that DiMare would dispute Sun Pacific's invocation of the Act of God clause. Trial Transcript, at 67:17-68:6 and 79:8-80:7.  "A party that with explicit reservation of rights performs or promises performance or assents to performance in a manner demanded or offered by the other party does not thereby prejudice the rights reserved. Such words as 'without prejudice,' 'under protest,' or the like are sufficient." Cal. Com. Code §1308 (applies to Cal. Com. Code §2209 modification by way of Cal. Com. Code §1102). California's law derived from and identical to U.C.C. §1-308 whose comment states, "This section provides machinery for the continuation of performance along the lines contemplated by the contract despite a pending dispute, by adopting the mercantile device of going ahead with delivery, acceptance, or payment 'without prejudice,' 'under protest,' 'under reserve,' 'with reservation of all our rights,' and the like. All of these phrases completely reserve all rights within the meaning of this section. The section therefore contemplates that limited as well as general reservations and acceptance by a party may be made 'subject to satisfaction of our purchaser,' 'subject to acceptance by our customers,' or the like."  The code provision is rarely cited, but in at least one case involving a sales contract, the seller who continued to make

1  deliveries under protest to a buyer who breached reserved the rights to sue for breach of the

2  underlying contract. <u>Shea-Kaiser-Lockheed-Healy v. Department of Water & Power</u>, 73 Cal.

3  App. 3d 679, 690 (Cal. App. 2nd Dist. 1977) ("As previously noted, however, such delivery was

4  expressly made under protest and with an explicit reservation of rights. It therefore did not

5  prejudice any of the rights reserved by [seller], including the right to sue [buyer] in damages for

6  this breach").   The importance of reserving objections is echoed in other parts of relevant

7  California law: "Where the contract for sale involves repeated occasions for performance by

8  either party with knowledge of the nature of the performance and opportunity for objection to it

9  by the other, any course of performance accepted or acquiesced in without objection shall be

10  relevant to determine the meaning of the agreement." Cal. Com. Code §2208 (repealed Stats

11  2006 ch. 254 §34, effective January 1, 2007).   One commentator even suggests that "To the

12  extent that the protest is given effect under common law or statute, it is obvious that there will be

13  occasions when the coercing party will insist that the protest be withdraw. Under such

14  circumstances a withdrawn protest should act as a protest." 2 Arthur Linton Corbin, Corbin on

15  Contracts, §7.21 at 480 (Joseph M. Perillo et al. eds., revised ed. 1995).   As the court is crediting

16  Mr. Licato's testimony, DiMare did reserve its right to assert the original terms of the Contract.

17

18  **D. Damages**

19       "Where the seller fails to make delivery or repudiates...the buyer may cancel and whether

20  or not he has done so may in addition to recovering so much of the price as has been paid (a)

21  'Cover' and have damages under the next section as to all the goods affected whether or not they

22  have been identified to the contract; or (b) Recover damages for nondelivery as provided in this

23  division (Section 2713)." Cal. Com. Code §2711(1).   "[T]he buyer may 'cover' by making in

24  good faith and without unreasonable delay any reasonable purchase of or contract to purchase

25  goods in substitution for those due from the seller.   (2) The buyer may recover from the seller as

26  damages the difference between the cost of cover and the contract price together with any

27  incidental or consequential damages as hereinafter defined (Section 2715), but less expenses

28  saved in consequence of the seller's breach. (3) Failure of the buyer to effect cover within this

1   section does not bar him from any other remedy." Cal. Com. Code §2712.  "[T]he measure of

2   damages for non-delivery or repudiation by the seller is the difference between the market price

3   at the time when the buyer learned of the breach and the contract price together with any

4   incidental and consequential damages provided in this division (Section 2715), but less expenses

5   saved in consequence of the seller's breach." Cal. Com. Code §2713(1).

6          DiMare seeks to collect cover damages under Section 2712.  In the alternative, DiMare

7   asserts it can collect damages under Section 2713. See Procacci Bros. Sales Corp. v. Frank's

8   Distrib. of Produce, LLC, 2009 U.S. Dist. LEXIS 42671, *31 (D. Ariz. Apr. 6, 2009) (applying

9   U.C.C. language identical to California law).  DiMare has provided a summary of the cover

10  purchases made and how they correspond to the Contract tomatoes. Defendant's Exhibit A.  This

11  table lists 102 purchases for the period 9/4-9/10 through 10/30-10/31 and seeks damages of

12  $1,225,362.  The information on this table comes from invoices DiMare received from the

13  suppliers. Joint Exhibit 12.  Additionally, DiMare seeks attorney's fees and costs for both the

14  present trial and the PACA Hearing.  Sun Pacific objects to DiMare's measure of damages on a

15  number of different bases.

16         First, DiMare's cover purchases did not always match the tomato categories of the

17  Contract.  DiMare purchased different types, sizes, and grades of tomatoes.  Sun Pacific argues

18  these purchases do not constitute valid cover.  "A buyer can cover through 'any reasonable

19  purchase,' and failure to mitigate reduces recoverable damages only when the course of action

20  chosen is affirmatively unreasonable or in bad faith. 'The test of proper cover is whether at the

21  time and place the buyer acted in good faith and in a reasonable manner, and it is immaterial that

22  hindsight may later prove that the method of cover used was not the cheapest or most effective.'"

23  Huntington Beach Union High School Dist. v. Continental Information Systems Corp., 621 F.2d

24  353, 357 (9th Cir. 1980), quoting Cal. Com. Code §2712 and U.C.C. §2-712, Official Comment

25  2.  "[T]here is no cover if the buyer does not purchase like goods but rather purchases goods

26  substantially different. This is not to say that the goods must be identical with those contracted

27  for, but the cover goods must be commercially usable as reasonable substitutes under the

28  circumstances of the particular case." Kanzmeier v. McCoppin, 398 N.W.2d 826, 831 (Iowa

1  1987) (applying Iowa law whose wording is identical to Cal. Com. Code §2712), citations

2  omitted.

3       In this case, the tomatoes under the Contract were resold to third parties.  Plaintiff has

4  provided DiMare's agreements with two of these third parties.  DiMare agreed to sell "US No 1

5  6x6 gas green tomato" to Jack in the Box and "25# 6x7 red & pink firm" tomatoes to IPC.

6  Plaintiff's Exhibit 18 and 20.  While the Jack in the Box contract appears to involve tomatoes

7  that fit a category covered by the Contract, the IPC contract does not.  From this evidence, it

8  appears that some variance in the grade, size, and color of tomato is considered commercially

9  reasonable.  Further, it is not clear whether the cover purchases of similar tomatoes cost more in

10  the aggregate.  The invoices show that Roma tomatoes of different sizes were often sold for the

11  same price. See Joint Exhibit 12, at 10, 11, 22, 35, 59, 71, 73; contra Joint Exhibit 12, at 9, 35,

12  48, 73.  As for differing grades, Mr. Janke was not able to state whether any of the cover

13  purchases were for #2 tomatoes. Trial Transcript, at 315:6-316:6.  However, some invoices do

14  indicate that #2 tomatoes were purchased.  For example, DiMare purchased from Pacific Triple E

15  both 6x6 Sunripe Jackie tomatoes for $18 and 6x6 JE tomatoes for $14. Joint Exhibit 12, at 31.

16  As Sun Pacific calls #1 tomatoes Airchiefs and #2 tomatoes Stardusts, Pacific Triple E appears to

17  call #1 tomatoes Sunripe Jackies and #2 tomatoes Stardusts.  While the quantities do not match

18  those required under the Contract, the court again relies on Mr. Licato's statement that there were

19  shortages in the specific tomato categories contained in the Contract.  DiMare's purchases,

20  though they do not all fit into the six catogories of the Contract, appear to generally qualify as

21  cover under Section 2712; the court need not resort to Section 2713.

22       Second, Sun Pacific argues that DiMare has made mathematical errors in calculating

23  damages.  For the week of 9/11-9/17, DiMare bought 1,760 boxes of vine ripened 4x5 Rounds

24  from Gargiulo (invoice number 182594) to cover 1,600 boxes of 5x5 rounds. Defendant's

25  Exhibit A, purchase 14.  DiMare asserts it bought 1,600 boxes of unspecified tomatoes from

26  Oceanside Produce to cover 6x7 Rounds the week of 9/11-9/17, but the corresponding invoice is

27  from Del Campo and shows sales of 1,600 boxes of Romas. Defendant's Exhibit A, purchase 21;

28  Joint Exhibit 12, at 9.  DiMare asserts it bought 1,600 boxes of Large Roma tomatoes from Del

Campo, load number 58311 to cover tomatoes for 10/30-10/31, but there is no invoice for that purchase. Defendant's Exhibit A, purchase 102.  These errors call for minor adjustments to the total damages.

Third, DiMare admits that it may have saved money on a number of purchases in October; those purchases were labeled "Load replaced at or below contract." Defendant's Exhibit A, at 4-5.  There is no evidence that DiMare has counted the monies saved through these purchases in calculating damages.  Sun Pacific argues that any savings on specific purchases should be offset against other damages.  Doc. 158, Sun Pacific's Proposed FOFCOL, at 48:27.  It appears that market prices for several categories of tomatoes fell below the Contract prices in October.  If Sun Pacific had not breached the Contract, DiMare would have been forced to purchase tomatoes at prices above market rates.  These savings logically constitute "expenses saved in consequence of the seller's breach."  "The remedies provided by this code shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed." Cal. Com. Code §1305(a).  Cover works that result quite literally.  The buyer obtains the breached goods and is reimbursed by the seller for any total cost above that specified in a contract; from the perspective of the buyer, the result is as if the seller had fully performed.  In an analogous case, a Michigan court ruled, "In procuring substitute goods to meet Phase II production requirements, defendant incurred additional charges on five of the purchase orders. One of the purchase orders was for precisely the same cost by the new subcontractor as would have been incurred for production of the goods by plaintiff. Three of the purchase orders for substitute goods resulted in a savings to defendant from the price that would have been owed to plaintiff for production of these same items. It is disingenuous of defendant to suggest that the monies saved on three of the purchase orders securing the substitute goods are not included as 'expenses saved in consequence of the seller's breach.'" Precision Master v. Mold Masters Co., 2007 Mich. App. LEXIS 1736, *13 (Mich. Ct. App. 2007) (applying Michigan law whose wording is identical to Cal. Com. Code §2712).  This result is consonant with the reasoning of commentators James White and Robert Summers who theorized that in a situation when the cover price was greater than the contract price but the shipping costs lower,

the savings from shipping should be offset against the increased purchase price as "the goal [is] placing the buyer in the position he would have been in had no breach occurred." See 1 White & Summers, Uniform Commercial Code § 6-3 (5th ed.).

DiMare did not provide figures showing the cost of cover purchases when it was able to buy tomatoes below Contract prices; there are no corresponding invoices.  DiMare has the burden of proving damages for breach of contract. See <u>Diversified Paratransit, Inc. v. Checkmate Staffing, Inc.</u>, 359 Fed. Appx. 736, 737 (9th Cir. 2009).  There are 16 purchases for which DiMare may have saved money. Defendant's Exhibit A, purchases 77, 82, 85-94, and 97-100.  DiMare obtained 13 of the purchases from Sun Pacific in early September for which DiMare remitted the Contract price.  DiMare seeks damages for the remaining 73 purchases.

Overall, DiMare's invoices are incomplete. Most strikingly, DiMare does not provide invoices for those purchases labeled "Load replaced at or below contract."  It is clear that DiMare's damages are less than claimed.  However, without the complete invoices, the court can not determine an exact amount by which they should be reduced.  Since there is no evidence of the actual amount DiMare saved, the court will have to make an estimate, weighted towards Sun Pacific to protect the party that does not carry the burden of proof.  To account for these various failures of proof, the court will reduce DiMare's damages by 20%.  DiMare is awarded $980,289 ($1,225,362 minus 20%) as cover damages.

DiMare was awarded $43,930.97 in attorney's fees and expenses for the PACA Hearing which Sun Pacific was to pay within thirty days of August 22, 2008.  As the prevailing party of an appeal under PACA, DiMare is entitled to additional attorney's fees and costs. 7 U.S.C. §499g(c).  The interest rate DiMare asks for is 2.18% pursuant to Judge Jenson's award and 28 U.S.C. §1961. Doc. 157, DiMare's Proposed FOFCOL, at 20:23-28. Sun Pacific suggests that Cal. Civ. Code §3289(b), which prescribes a 10% interest rate, applies to breach of contract claims. Doc. 158, Sun Pacific's Proposed FOFCOL, at 35:2-3.  As DiMare only asks for 2.18%, the court will award the lesser rate and assume no objection on the part of Sun Pacific.

**IV. Order**

For contract damages, Sun Pacific shall pay DiMare $980,289 with interest of 2.18% per annum from November 1, 2006 until paid.  For attorney's fees and costs before the PACA Hearing, Sun Pacific shall pay Dimare $43,930.97 with interest of 2.18% per annum from September 23, 2008 until paid.  DiMare may submit a motion for attorney's fees and costs associated with this bench trial in accord with Local Rule 230.


IT IS SO ORDERED.

Dated:   _August 12, 2011_       _____

                                 CHIEF UNITED STATES DISTRICT JUDGE